**Angelo F. CONIGLIO, Plaintiff-Appellant,**

**v.**

**HIGHWOOD SERVICES, INC., et al.,**
**Defendants-Appellees.**

**No. 738, Docket 73-2448.**

United States Court of Appeals,
Second Circuit.

Argued March 27, 1974.

Decided April 17, 1974.

David Berger, Philadelphia, Pa. (H. Laddie Montague, Jr., Joel C. Meredith, Steven J. Greenfogel, Philadelphia, Pa., Irving M. Shuman and Gross, Shuman, Wiltse & Laub, Buffalo, New York City, on the brief), for plaintiff-appellant.

Frank G. Raichle, Buffalo, New York City (Raichle, Banning, Weiss & Halpern, Buffalo, New York City, on the brief; Ralph L. Halpern, David C. Diefendorf, New York City, of counsel), for defendant-appellee Highwood Service Inc.

Paul J. Tagliabue, Washington, D. C. (Hamilton Carothers, Washington, D. C., on the brief; Covington & Burling, Washington, D. C., of counsel), for defendants-appellees National Football League and Pete Rozelle.

Before KAUFMAN, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Whatever else might be said about professional football in the United States, it does seem to breed a hardy group of fans who do not fear litigation combat. No fewer than five lawsuits have been instituted by football aficionados from Dallas to New England, each claiming that the respective defendant National Football League (NFL) team had violated the Sherman Act by requiring an individual who wishes to purchase a season ticket for all regular season games to

buy, in addition, tickets for one or more exhibition or preseason games. In each case, including the instant one, the response of the district court has been the same: To dismiss the complaint upon the defendant's motion for summary judgment.[1] Without passing upon the wisdom or desirability of this ticket sale *modus operandi*, we find the practice to be outside the ambit of even the broad reach of the Sherman Act. Accordingly, we affirm.

## I.

Angelo F. Coniglio is a resident of Amherst, New York, a suburb of Buffalo. An employee of the New York State Power Authority, Coniglio's vocation is hydraulic engineering; his avocation—avid football fan and ardent rooter for the Buffalo Bills football team (Bills).

The Bills, owned and operated by Highwood Service, Inc. (Highwood), was a charter member of the American Football League (AFL), playing its inaugural season in 1960. From its inception, the Bills has been the only professional football team in Buffalo, indeed, filling a void of more than one decade's duration since the demise of the All American Conference in 1949.

Although Coniglio regularly attended the Bills home games from 1960 onward, he did not become a season ticket holder until 1964. With this new status, he gained a number of advantages over those who purchased tickets on an individual game basis, such as, preferential seat selection, preferential call on postseason playoff tickets, and preferential seat selection for the following season.

Coniglio repeated his season ticket purchase in 1965.

The year 1966 produced two events of some significance to Bills fans. First, the American Football League and its arch rival, the older National Football League, tentatively agreed to merge into one league, provided congressional approval, obviating a possible antitrust violation, could be obtained. Second, the Bills altered its season ticket sale policy by requiring the purchaser of a season ticket to also buy a ticket for one exhibition game.

In 1968, the Bills increased the number of exhibition games included in the season ticket package to two. And, two years later, in 1970, the season ticket holders were required to purchase tickets for three exhibition games. Whether because of this or perhaps because of the congressionally sanctioned[2] merger between the AFL and the NFL,[3] which was also consummated in 1970, the Bills that year saw the end of Coniglio as a season ticket purchaser. The record does reflect, however, that in 1971 Coniglio attended five of the seven regular season home games played by the Bills at Buffalo's War Memorial Stadium, by purchasing individual tickets for each game, and that Coniglio, in fact, had chosen not to attend the two remaining home games that year.

Disenchanted with the Bills's season ticket sale practice, Coniglio commenced an antitrust action against Highwood, the NFL, and its Commissioner, Pete Rozelle, by filing a complaint in the Western District of New York on September 9, 1970. He claimed that for the

---

1. Grossman Development Co. v. Detroit Lions, Inc., 1973–2 CCH Trade Cas. ¶ 74,790 (E.D. Mich.1973), appeal docketed, No. 74–1093 (6th Cir. 1974); Laing v. Minnesota Vikings Football Club, Inc., 1973–2 CCH Trade Cas. ¶ 74,-601 (D.Minn.1973), aff'd, No. 73–1625 (8th Cir. Feb. 11, 1974); Driskill v. Dallas Cowboys Football Club, Inc., 1973–1 CCH Trade Cas. ¶ 74,544 (N.D. Texas 1973), appeal docketed, No. 73–2659 (5th Cir. 1973); Pfeiffer v. New England Patriots Football Club, Inc., 1973–1 CCH Trade Cas. ¶ 74,267 (D.

Mass.1972), appeal dismissed, No. 72–1306 (1st Cir. Nov. 1, 1972).

2. *See* 15 U.S.C. § 1291.

3. According to Coniglio's deposition, he was an organizer of the AFL Identity Committee in Buffalo. The Committee's purpose, Coniglio stated, was to urge restoration of the name "American Football League," and use of the AFL's emblem, both of which had been dropped when the merger became effective in 1970.

period, 1966–1970, Highwood's policy of conditioning the purchase of season tickets, to a requirement to buy exhibition game tickets, constituted an unlawful tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Moreover, he charged, it also constituted an abuse of the Bills's monopoly power over professional football in the Buffalo area, in breach of Section 2 of the Sherman Act, 15 U.S.C. § 2. In addition, Coniglio alleged that the unlawful tie between season tickets and exhibition game tickets was the product of a conspiracy between Highwood, the NFL, and Rozelle, and that such conspiracy was a further violation of Section 1 of the Sherman Act.

Coniglio initially sought to maintain this suit as a class action,[4] on behalf of approximately 750,000 season ticket holders of the Bills as well as a number of other NFL clubs, against a defendant class represented by Highwood. In this latter class Coniglio included all NFL clubs with season ticket policies mandating the purchase of exhibition game tickets. Following more than two years of pretrial discovery during which a substantial number of documents were produced by Commissioner Rozelle, the late Judge Henderson, on September 18, 1972, entered an order upon motion of the defendants limiting the plaintiff class to some 23,000 Bills season ticket holders,[5] and denying Coniglio's motion to establish a defendant class.[6]

On March 21, 1973, after additional discovery of documentary evidence and the completion of Coniglio's deposition— the only oral deposition taken by either side—the defendants moved for summary judgment. On August 1, 1973, Judge Henderson, in a brief opinion reported only in 1973–2 CCH Trade Cas. ¶ 74,795 (W.D.N.Y.1973), granted the motions and dismissed the complaint.

## II.

We proceed directly to a consideration of the law applicable to the alleged Sherman Act violations. In *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958), the Court concisely defined a tying arrangement as:

> an agreement by a party to sell one product but only on the condition that the buyer also purchase a different [or tied] product. . . .

*Northern Pacific Railway Co. v. United States*, *supra*, 356 U.S. at 5, 78 S.Ct. at 518. The Court further elucidated the subject by describing the basis upon which a tying arrangement would be found to be a violation of Section 1 of the Sherman Act.

> [Tying arrangements] are unreasonable [restraints of trade and commerce] in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of interstate commerce is affected.

*Id.* at 6, 78 S.Ct. at 518. Thus, using *Northern Pacific* as a springboard for our analysis, we can identify four factors essential in determining whether a particular sales practice constitutes an illicit tying arrangement:

(1) two separate and distinct products, a tying product and a tied product;

(2) sufficient economic power in the tying market to coerce purchase of the tied product;

(3) anti-competitive effects in the tied market;

(4) involvement of a "not insubstantial" amount of interstate commerce in the tied market.

---

4. Pursuant to Fed.R.Civ.P. 23(b)(1)(B) and 23(b)(3).

5. There are 46,206 seats in War Memorial Stadium.

6. His decision is reported at 60 F.R.D. 359 (W.D.N.Y.1972).

▮ It seems clear, at the outset, that the fourth factor is easily satisfied in this instance since, in 1970 alone, the total value of tied exhibition game tickets was approximately $483,000.[7] In International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), roughly $500,000 of interstate commerce was deemed sufficient. *And see* Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

▮ We turn next to the second *Northern Pacific* prerequisite—the power to coerce purchase of the tied product—for the district judge rested his decision on the ground that the Bills lacked sufficient economic power in the season ticket (or tying) market to coerce purchase of exhibition game tickets. Judge Henderson concluded that since more than half of the 46,206 seats at War Memorial Stadium could be purchased on an individual game basis (as Coniglio himself did in 1971), "there is no tying problem even though the seller may offer a package of both season and preseason [exhibition] game tickets. See Northern Pacific Ry. v. United States, 356 U.S. 1, 6 [78 S.Ct. 514, 2 L.Ed.2d 545] (1958)." *And see* Laing v. Minnesota Vikings Football Club, Inc., *supra*; Driskill v. Dallas Cowboys Football Club, Inc., *supra*; Pfeiffer v. New England Patriots Football Club, Inc., *supra*. *But see* Laing v. Minnesota Vikings Football Club, Inc., *supra*, (Lay, J. concurring) (declining to find no coercive power as a matter of law where only 2,500 to 4,000 tickets available on individual game basis). Although the question is indeed a close one, we believe that, despite the relatively large quantity of individual game tickets available here, the district court's conclusion, that as a matter of law the requisite coercive power was absent, is erroneous.

The district judge's reliance on *Northern Pacific* in the factual context of this case seems to have been misplaced. In *Northern Pacific,* the Court noted that "where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." Northern Pacific Railway Co. v. United States, *supra*, 356 U.S. at 6 n. 4, 78 S.Ct. at 518. Here, however, the buyer is not "free to take either product [season ticket or exhibition game ticket] by itself." Indeed, it is undisputed that a season ticket could not be purchased unless a certain number of exhibition game tickets, three in 1970, were purchased as well.

Appellee Highwood responds that a season ticket is no more than the sum of its parts—the individual regular season football games played by the Bills in Buffalo—and, therefore, the availability of tickets on an individual game basis eliminates the coercive tie under *Northern Pacific.* We have already referred to the advantages obtained through the purchase of a season ticket, principally the preferential seat selection accorded the season ticket holder. Although Highwood would thus have us characterize this suit as one to "guarantee every spectator a seat on the 50-yard line for the home games of the Bills,"[8] we are not inclined to take so disparaging a view. Rather, we are mindful of the test for coercive power announced by a unanimous Court in United States v. Loew's Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962):

> [T]he crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes.

That approximately 23,000 people were "willing" to purchase season tickets in a stadium that can seat only 46,000, is

---

7. In 1970, there were about 23,000 season ticket holders and each was required to purchase 3 exhibition game tickets at $7 apiece. The total paid by them for these 3 games approximated $483,000.

8. Brief of Appellee Highwood Service, Inc. at 2.

certainly some evidence of the "desirability" of these tickets, sufficient at least to persuade us that the existence of the requisite economic power is a triable issue of fact.

Highwood contends that in any event there is no tying arrangement, lawful or otherwise, because the first prerequisite—the separability of the tying and tied products—has not been satisfied in this case. *See e. g.* Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). It argues that exhibition football games and regular season contents are substantially equivalent, each involving a struggle between two professional football teams fielding eleven-man units with the object of the battle being to get that pigskin across the goal line whether by brain or brawn or both. *See* Pfeiffer v. New England Patriots Football Club, Inc., *supra*, 1973–1 CCH Trade Cas. ¶ 74,267 at 93,265. Coniglio answers that exhibition games are clearly inferior to regular season games. He argues cogently that the exhibition season is virtually conceded [9] to be the time for experimentation with line-ups, plays, etc., during which the won-loss record is of distinctly secondary importance.

■ Product separability based on quality differentiation has been an essential ingredient in a long line of tying cases. *See e. g.* United States v. Loew's, Inc., *supra* (block sale of desirable and undesirable movies); American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272 (2d Cir. 1067) (block sale of television advertising for both desirable and undesirable television stations); Associated Press v. Taft-Ingalls Corp., 340 F.2d 753 (6th Cir.), cert denied, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.

2d 66 (1965) (block sale of desirable and undesirable wire services). To be sure, Highwood urges in response that quality is a continuum on which distinctions could be drawn between each regular season game as well. Although there is a measure of validity in Highwood's position, *see* Shayne v. Madison Square Garden Corp., 1974 CCH Trade Cas. ¶ 74,920 at 96,123 (E.D.N.Y.1973), appeal dismissed, 491 F.2d 397 (2d Cir. 1974), we believe that the distinction between exhibition and regular season contests is sufficiently sharp, at the very least, to render the factual determination of product separability more appropriate for a trial rather than for summary judgment. Grossman Development Co. v. Detroit Lions, Inc., *supra*, 1973–2 CCH Trade Cas. ¶ 74,790 at 95,539.

■ With Coniglio having successfully traversed three quarters of the field, Highwood raises its final but insurmountable barrier. It contends that Coniglio failed, as a matter of law, to demonstrate an anti-competitive effect in the tied (exhibition football game) market. Quite simply, just as the Bills has a monopoly [10] over the presentation of regular season professional football games in the relevant geographic market, which is Buffalo,[11] so too does it have a monopoly over the presentation of exhibition professional football games— the tied product. Thus, Highwood is not using its economic power in the tying (season ticket) market to "restrain free competition in the market for the tied product," Northern Pacific Railway Co. v. United States, *supra*, 356 U.S. at 5, 78 S.Ct. at 518, for it is undisputed that, at the time this complaint was filed, there were neither actual nor potential competitors to the Bills in the professional football market.[12] Accordingly, the ty-

9. Coniglio has included in the record a number of newspaper articles in which professional football coaches rationalize poor performance during the exhibition season on the experimentation theory.

10. Coniglio does not suggest that this monopoly position was in any way secured in contravention of the Sherman Act, 15 U.S.C. §§ 1, 2.

11. As of 1970, the closest major league professional football team to the Buffalo Bills was the Cleveland Browns, some 189 miles away.

12. We are not unaware of the recent commotion over the nascent World Football League (WFL), which is slated to begin its first season of play this summer. Coniglio does not contend, however, that the WFL was even a glimmer in anyone's eye in 1970.

ing arrangement attacked by Coniglio does not fall within the realm of contracts "in restraint of trade or commerce" proscribed by Section 1 of the Sherman Act, 15 U.S.C. § 1. *See* Laing v. Minnesota Vikings Football Club, *supra*; Grossman Development Co. v. Detroit Lions, Inc., *supra*.

Coniglio tries strenuously but unsuccessfully to skirt this obstacle. He argues that the tying arrangement foreclosed competition in what could only be characterized at oral argument as the "general entertainment market in Buffalo." Support for this obviously vague assertion, moreover, is limited to a self-serving statement in Coniglio's affidavit in opposition to summary judgment which reads:

> There are alternative activities available on Friday and Saturday evenings [when the Bills's home exhibition football games were generally played] which are attractive to me, including movies, some live theater, and music programs. As a season ticketholder with seats to exhibition games forced upon me at up to $7 per seat, I was precluded from seriously considering alternative activities on game nights.

Not only does this fall far short of Fed. R.Civ.P. 56(e)'s requirement that an affidavit in opposition to a motion for summary judgment "set forth specific facts showing that there is a genuine issue for trial," but we consider the purportedly relevant product market so broadly defined as to render that concept all but meaningless as an analytic tool for assessing the anti-competitive effect requisite to a Sherman Act violation.

■ We agree with the court in American Aloe Corp. v. Aloe Creme Laboratories, Inc., 420 F.2d 1248 (7th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970) and 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970), reh. denied, 400 U.S. 856, 91 S.Ct. 24, 27 L. Ed.2d 95 (1970), that "[b]efore there can be a conclusion as to whether there has been . . . a contract in restraint of trade, a determination must be made as to what are the relevant product markets within which to gauge a firm's power or the effect of its activities." In defining the relevant product market, moreover, we are guided by the oft-cited analysis in Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L. Ed.2d 510 (1962):

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. (footnote omitted)

And, the Court in *Brown Shoe* added that, in determining product line differential, such considerations as the existence of characteristics peculiar to a particular product and product appeal to a distinct class of customers would prove illuminating. Viewed in this light, Coniglio's claim that plays, movies, and musicals are all within the boundaries of the same product market as exhibition football amounts to nothing more than the boundless contention that, by extracting extra dollars from season ticket holders, the Bills leave less in their pockets to spend on any other form of diversion, from a trip to the zoo to a night at the opera. Suffice to say that the extraordinary breadth of the market encompassing such diverse yet assertedly competitive products is far beyond that ever contemplated for a *relevant* product market.

■ Nor can Coniglio bootstrap his hollow claim of an anticompetitive effect into a triable issue by relying on the Supreme Court's admonition in Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), that summary judgment may not be appropriate for complex antitrust litigation "where motive and intent play leading roles, the proof is largely in the hands of alleged conspirators, and hostile witnesses thicken the plot." (footnote omitted). Unlike *Poller*, in which the key issue was intent to monopolize, the propriety of summary

judgment in this case rests on Coniglio's total failure to demonstrate any adverse effect on competition, actual or potential, an issue perfectly well suited to objective, statistical analysis. In such instances, summary judgment is properly granted to lower the curtain on costly litigation where it is clear beyond cavil that one side simply has no support for its version of alleged facts. *See* Community of Roquefort v. William Faehndrich, Inc., 303 F.2d 494, 498 (2d Cir. 1962).

Coniglio also seeks to avoid the lack of demonstrable, anti-competitive impact of the Bills's ticket sale practice by contending that a deleterious effect on competition is not essential to prove a violation of Section 1 of the Sherman Act. He claims it is sufficient that the tying arrangement merely interfere with the consumer's freedom of choice in deciding whether to purchase the tied product. Although courts have occasionally referred to this as a primary evil of the tying arrangement, *see e. g.* Associated Press v. Taft-Ingalls, Corp., *supra*, 340 F.2d at 762, it represents no more than the causal determinant of the proscribed restraint on competition in the tied market which ordinarily results from such interference. *Associated Press,* heavily relied upon by Coniglio, is not to the contrary, for the court was careful to note the existence of United Press International as a competitive wire service. Associated Press v. Taft-Ingalls, Corp., *supra*, 340 F.2d at 762, 764. *See also* American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, *supra* (adverse effect on competition among television networks for advertising). In sum, therefore, neither the cases marshalled by appellant nor the plain language of Section 1, which speaks specifically of contracts "in restraint of trade or commerce," support his contention that Section 1 can be violated absent a showing of such restraint.[13]

 Finally, Coniglio turns to Section 2 of the Sherman Act, 15 U.S.C. § 2, and argues that, in establishing the tying arrangement, Highwood violated that section by unlawfully abusing its monopoly power in the professional football market. Mr. Justice Douglas's opinion for a majority of the Court in United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), sets forth the governing rule:

> [T]he use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.

334 U.S. at 107, 68 S.Ct. at 945. Accordingly, since we have made plain that Highwood has not used the tying arrangement either to prevent competition or destroy it, its ticket sale practice does not represent an unlawful abuse of its monopoly power. *See* United States v. Grinnell Corp., 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. Aluminum Co. of America, 148 F.2d 416, 429–430 (2d Cir. 1945).

As for the remaining defendants, the NFL and its Commissioner, Pete Rozelle, it is readily apparent that if Highwood's tying arrangement is not unlawful, an agreement among the defendants to establish that practice, even if it could be proven,[14] would not be unlawful either.

Affirmed.

---

13. Of course, we do not mean to suggest that the consumer lacks standing to raise a Sherman Act claim where he can prove that a foreclosure of competition in violation of Section 1 caused him injury by, for example, artificially elevating prices. *See e. g.* Fortner Enterprises, Inc. v. United States Steel Corp., supra, 394 U.S. at 497, 89 S.Ct. 1252.

14. We note that the record before us does not present a convincing case for conspiracy in any event. The Bills instituted the challenged season ticket package policy in early 1966, four years *prior* to its entry into the NFL, although admittedly only some nine or ten months before Pete Rozelle became, according to his own affidavit in support of the motion for summary judgment, the Commissioner of both the AFL and the NFL in October 1966. Moreover, of the 26 teams in the NFL following the merger, at least 10 did not utilize a season ticket sale policy even remotely similar to that used by the Bills.