BRISCOE, Circuit Judge,
dissenting.
After a nine-day jury trial in this antitrust case, the district court instructed the jury as to the elements of a per se tying claim. Those instructions correctly stated the law. The jury found for plaintiffs on each element and awarded $6,313 million in damages to the plaintiffs. The evidence presented at trial was sufficient to support the jury’s conclusion on each element. Nevertheless, the district court granted the defendant’s renewed motion for judgment as .a matter of law, and the majority affirms that decision, vacating the jury’s verdict.
I respectfully dissent. I would reverse the grant of judgment as a matter of law and reinstate the jury verdict against the defendant on the issue of liability. Were we to reach the issues raised by defendant in its cross-appeal, I would remand for a new trial as to damages under a package approach instruction.
I
According to the Supreme Court, the law is and always has been that “certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable ‘per se.’ ” Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 9, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Of course, “not every refusal to sell two products separately can be said to restrain competition.” Id. at 11, 104 S.Ct. 1551. Thus, our inquiry is whether the alleged tie is one which merits per se condemnation. In fact, per se claims, by their nature, focus on the character of the alleged anti- *1113 competitive conduct, not on the actual market effects that conduct may or may not have caused. Per se illegal agreements or practices are those that, “because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.” N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). In cases alleging per se violations of the Sherman Act, unlike general claims that a particular practice unreasonably restrains trade, courts look to the nature of the agreement or practice, not the actual market effects of that conduct. See id.; Jefferson Par., 466 U.S. at 21, 104 S.Ct. 1551 (“The definitional question depends on whether the arrangement may have the type of competitive consequences addressed by the rule.”). If the challenged conduct, by its nature, is of the type that has been declared presumptively illegal, then the inquiry ends; courts need not, and should not consider the actual market effects. NCAA v. Board of Regents, 468 U.S. 85, 103-04, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (“Per se rules are invoked when surrounding circumstances make the likelihood of anticompeti-tive conduct so great as to render unjustified further examination of the challenged conduct.” (emphasis added)). In such cases, the harm to competition is presumed. Id. (distinguishing between per se claims and general Sherman Act claims based on “whether the ultimate finding is the product of a presumption or actual market analysis” (emphasis added)).
In Jefferson Parish Jefferson Hospital District Number 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Supreme Court stated unequivocally, “[i]t is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable ‘per se.’ ” Jefferson Par., 466 U.S. at 9, 104 S.Ct. 1551. This rule has been endorsed by the Court many times since it was “first enunciated in International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947),” and it “reflects congressional policies underlying the antitrust laws.” Jefferson Par., 466 U.S. at 9-11, 104 S.Ct. 1551 (citing H.R. Rep. No. 627, 63d Cong., 2d Sess., 10-13 (1914); S. Rep. No. 698, 63d Cong., 2d Sess., 6-9 (1914)). Thus, our analysis must focus on the nature of the challenged conduct, not on a market analysis of the actual effects that conduct has had. In a per se tying claim “we must consider whether [defendants] are selling two separate products that may be tied together, and, if so, whether they have used their market power to force their [customers] to accept the tying arrangement.”[1] Id. at 18,104 S.Ct. 1551.
*1114 A. Separate Products
Our first inquiry is whether the products in question are actually separate products that may be illegally tied. This question has also been framed by the Supreme Court as a question of whether “a substantial volume of commerce is foreclosed” by the tie. Id. at 16, 78 S.Ct. 514 (citing Fortner Enters. v. United States Steel Corp. (Fortner I), 394 U.S. 495, 501-02, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969)); N. Pac. Ry., 356 U.S. at 6-7, 78 S.Ct. 514; Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 608-10, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Int’lSalt, 332 U.S. at 396, 68 S.Ct. 12. More recently the Court described, it as “a threshold matter” of whether there is “a substantial potential for impact on competition in order to justify per se condemnation.” See Jefferson Par., 466 U.S. at 16, 104 S.Ct. 1551.
This threshold question is necessary because “[i]f only a single purchaser were ‘forced’ with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law.” Id. “Similarly, when a purchaser is ‘forced’ to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.” Id.
According to the Supreme Court, “the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items.” Id at 19, 104 S.Ct. 1551. Courts must determine whether the products are “distinguishable in the eyes of buyers”—whether there is “a sale involving two independent transactions, separately priced and purchased from the buyer’s perspective.” Id at 19-20, 104 S.Ct. 1551. Courts should consider whether other sellers offer or could offer the products separately, whether customers are charged separately for the two products, and whether the tied product is fungible. Id. at 22-23, 104 S.Ct. 1551; M. at 23 n.39, 104 S.Ct. 1551 (citing United States v. Jerrold Elecs. Corp., 187 F.Supp. 545 (E.D. Pa. 1960), aff'd, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961) (per curiam)). Whether two products or services “are functionally linked ... is not in itself sufficient” to answer the question. Id. at 19 n.30, 104 S.Ct. 1551. The Court “ha[s] often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices.” Id (collecting cases). “In fact, in some situations the functional link between the two items may enable the seller to maximize its monopoly return on the tying item as a means of charging a higher rent or purchase price to a larger user of the tying item.” LI
Only once has the Supreme Court held that two products were not separate. “In Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), the Court held that a tying arrangement was not present because the arrangement did not link two distinct markets for products that were distinguishable in the eyes of buyers.” Jefferson Par., 466 U.S. at 19, 104 S.Ct. 1551. Specifically, in that case, the Court held that, although *1115 two newspapers were separate and distinct from the perspective of readers, that “d[id] not necessarily imply that advertisers bought separate and distinct products when insertions were placed in the [two papers].” Id. at 19 n.31, 104 S.Ct. 1551. There was no evidence “that advertisers viewed the city’s newspaper readers, morning or evening, as other than fungible customer potential.” Id. The Court “assume[d], therefore, that the readership ‘bought’ by advertisers in [one paper] was the selfsame ‘product’ sold by the [other paper]....” Id. “The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant ‘tying’ product, resulting in economic harm to competition in the ‘tied’ market.” Id. (quoting Times-Picayune, 345 U.S. at 613-14, 73 S.Ct. 872). The Court concluded, “two newspapers under single ownership at the same place, time, and terms sell indistinguishable products to advertisers; no dominant ‘tying’ product exists ... no leverage in one market excludes sellers in the second, because for present purposes the products are identical and the market the same.” Id. (quoting Times-Picayune, 345 U.S. at 613-14, 73 S.Ct. 872). In short, if the tied and tying product markets are in fact the same market, there can be no unlawful tie because the seller is not exploiting its power in one market to coerce buyer behavior in another.
In addition, courts of appeals have found that tying arrangements are not deserving of per se condemnation when no other seller could potentially sell the product. These are cases in which the seller has a natural monopoly oyer both the tied and tying products. See, e.g., Coniglio v. Highwood Services, Inc., 495 F.2d 1286, 1291-92 (2d Cir. 1974) (concluding there was no illegal tie between tickets to regular season professional football games and tickets to exhibition football games because the seller of tickets had a natural monopoly in both the tying and the tied product markets); Driskill v. Dallas Cowboys Football Club, Inc., 498 F.2d 321, 323 (5th Cir. 1974) (following Coniglio and concluding that “the [seller has] a complete monopoly in the tied market ... and there can thus be no adverse effect on any competitors, even if a tying scheme exists”); Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 835 (7th Cir. Ill. Oct. 11, 1978) (citing Coniglio and Driskill for the proposition that when the seller has a complete monopoly in both the tied and tying markets, there can “be no foreclosure of competitive access to the tied market resulting from the tie-in”). In these cases, it is not merely that potential sellers of the tied product were uninterested in selling the tied product due to any number of market realities, but that those potential sellers were incapable of selling the tied product because some other seller already possessed a lawfully obtained monopoly in that market. If the seller has a natural' monopoly in both the tying and tied product markets, a tying arrangement cannot harm competition in the tied product market, so there can be no illegal tie.
Similarly, when the tied product is completely unwanted by the buyer such that no market exists for that product, there can be no per se illegal tying arrangement. See, e.g., Blough v. Holland Realty, Inc., 574 F.3d 1084, 1089 (9th Cir. 2009) (“Zero foreclosure exists where the tied product is completely unwanted by the buyer.”); Reifert v. S. Cent. Wisconsin MLS Corp., 450 F.3d 312, 323 (7th Cir. 2006) (“Despite Reifert’s desire to avoid purchasing a Realtors Association membership, without evidence of competitors in the market for services offered by the Realtors Association, there can be no foreclosure of competition.”); Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 815 (1st Cir. 1988) (“Wells has failed to *1116 demonstrate the slightest market for membership in real estate boards that might have been affected by the defendants’ alleged tying arrangement.”); id. at 815 n.ll (“Wells’ real error here was in failing to show that there was a ‘market’ at all for real estate board membership.”). These cases dealt with purported ties between a real estate listing service and membership in a realtors’ association, Reifert, 450 F.3d at 323; Wells Real Estate, 850 F.2d at 805, or between sale of undeveloped lots and realtor’s commission for the sale of those lots, Blough, 574 F.3d at 1088. In these circumstances, the “tied product” was not a separate product at all, but merely an item tacked on by the seller to increase the total price for the primary product. Id. at 1089-90. These arrangements have “nothing to do with gaining power in the [tied] market or upsetting competition there.” Id. at 1090 (quoting IX Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1724b, at 270(2004 & Supp. 2009)). A buyer cannot purchase a realtor’s services separate from the purchase of land, and membership in a realtors’ association provides no benefits aside from the ability to use the multiple listing service, so the markets for those “products” did not exist. Instead, the “products” were merely an additional cost included in the desired product or service. See id. If the market for the tied product does not exist at all, then competition cannot be harmed in that non-existent market, so there can be no illegal tie.
Although courts have framed this inquiry as several various elements of a tying claim, the essential inquiry is the same: Has the seller linked two distinct product markets in a way that could impair competition in the tied market? This is the threshold inquiry described by the Supreme Court in Jefferson Parish.
B. Market Power
When two separate products are tied, courts must next consider whether the seller has “sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product.” N. Pac. Ry. Co., 356 U.S. at 6, 78 S.Ct. 514. “[T]he essential characteristic of an invalid tying arrangement lies in the seller’s exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.” Jefferson Par., 466 U.S. at 12, 104 S.Ct. 1551. This is because, when a seller conditions the sale of one commodity on the purchase of another, it “coerces the abdication of buyers’ independent judgment as to the ‘tied’ product’s merits and insulates it from the competitive stresses of the open market.” Id. at 12-13, 104 S.Ct. 1551. Thus, “when the seller has some special ability—usually called ‘market power’—to force a purchaser to do something that he would not do in a competitive market,” id. at 13-14, 104 S.Ct. 1551, then “ ‘forcing’ is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated,” id. at 12, 104 S.Ct. 1551.
C. Tenth Circuit Case Law
The Supreme Court has instructed us to answer two questions: First, has the seller linked two separate product markets? Second, has the seller used its market power in the tying product market to coerce buyer behavior in the tied product market? Each Circuit, including ours, defines the elements of a tying claim slightly differently. We have required plaintiffs to show:
(1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase *1117 of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a “not insubstantial” amount of interstate commerce in the tied product is affected.
Suture Express, Inc. v. Owens & Minor Distrib., 851 F.3d 1029, 1037 (10th Cir. 2017) (quoting Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 886 (10th Cir. 1997)). In my view, our first, second, and fourth elements address whether two separate product markets have been tied together by the seller such that there is a substantial potential for impact on competition in order to justify per se condemnation; our third element addresses whether the seller has market power in the tying product market sufficient to enable it to coerce buyer behavior in the tied product market.
II
With that framework in mind, I turn to the evidence presented in this case. Because there is no small amount of disagreement as to what is meant by the Tenth Circuit’s expression of the elements, and because the Tenth Circuit’s expression of the test is presumptively within the bounds set by the Supreme Court, I will focus on the elements as the Supreme Court has described them. The evidence presented at trial was sufficient to support a jury finding that Cox linked the otherwise separate product markets for premium cable services[2] and set-top boxes, and that Cox used its market power in the market for premium cable services to coerce its customers into renting set-top boxes from Cox, thereby presumptively harming competition in the market for set-top boxes.
A. The Tie
The evidence presented at trial was sufficient to support a jury finding that Cox conditioned the sale of Advanced TV services on rental of a set-top box from Cox. Throughout the relevant period, Cox’s website stated: “In order to receive interactive TV services offered by Cox, such as the interactive programming guide, on-de* mand, pay-per-view, and all-digital programming options, you must rent a digital receiver.”[3] J.A. vol. L, at 6165-66 (emphasis added). If consumers wanted to get interactive TV services from Cox, “they had to rent that set-top receiver from Cox.” Id. at 6166.
Further, Colleen Langer, Vice President of Marketing for Cox, testified that the Cox website for ordering cable “would force you to say what type of box do you want.” J.A. vol. XXVII, at 4014-15. When asked to elaborate, she stated:
[The website] won’t let you go any further unless you click one of those— check one of those boxes. You can’t order advanced TV without having equipment. So at that point in time the system knows that in order to complete your order that this customer is going to need either a digital set-top box or advanced set-top box, which would be the *1118 HD DVR and they would have to click on it and that price would show up.
Id. at 4015 (emphasis added). When asked, “[i]s there an option for ‘none of the above’ or ‘I don’t want a box’ for a customer to say they don’t want a box?,” Langer responded “[t]he only other option is if they want a CableCARD,” “[w]hich they would also have to rent from Cox.” Id. at 4016. She also testified that there was no option for customers to order digital cable without also ordering equipment, specifically, “they cannot complete the order” without doing so; “[i]t would error.” Id. at 4016-18.
This coercion was not limited to internet sales. Charles Wise, Vice President of Customer Care for Cox, testified that, when customers call for services, “[t]he service representative communicates to the customer that the services that they desire either require a DCR or require a Setr-Top box for those advanced features, and then they’re communicated to what the cost of the package is and what the cost of the equipment is.” Id. at 4040 (emphasis added). As a general matter, Steve Necessary, Vice President of Video Product Development and Management for Cox, testified that “[f]rom 2005 to 2012 in Oklahoma, to fully access all of the content and services ... customers had to lease set-top boxes from Cox.” J.A. vol. LI, at 6416.
B. Separate Products
This arrangement, conditioning the provision of premium cable services on the rental of a set-top box, will merit per se condemnation only if premium cable services and set-top boxes are two separate products from the perspective of buyers. They are.
As an initial matter, Cox stipulated that, based on the nature of consumer demand for premium cable services and set-top box rental, these were separate products. See J.A. vol. XXIII, at 3440; J.A. vol. II, at 276. The jury was instructed to find for the plaintiffs on this element. J.A. vol. Ill, at 588. At trial, Steve Necessary also testified that the set-top box and the service were separate products. J.A. vol. LI, at 6491-92. Because there is apparently some confusion as to what legal significance Cox intended this admission to have, I will address the separate products analysis by considering those factors the Supreme Court has instructed us to consider: whether other sellers offer or could offer the products separately, whether customers are charged separately for the two products, and whether the tied product is fungible
First, there was evidence that other sellers did offer the products separately. Lawrence Harte testified as an expert witness for the plaintiffs and provided his conclusion that other cable companies did provide cable services separate from set-top box rental or purchase. Id. at 6367. Specifically, he cited Rogers in Canada and Virgin Media in the U.K. Id Further, there was evidence that numerous other sellers in the United States could also offer the products separately if they so chose. Harte testified that Cisco was already manufacturing a box that was technologically compatible with Cox’s Advanced TV service system—the very same box, in fact that Cox was buying from Cisco and then renting to its customers. Id. at 6399-6400. According to the contract between Cox and Cisco, nothing prevented Cisco from selling those boxes directly to customers, separate from the provision of premium cable services. Id 6376. Further, Cisco’s •conditional access security function, Pow-erKEY, was installed on Cisco’s set-top boxes and allowed content providers to limit the content accessible on a given box. Id. at 6398-99’. Cisco was free to license PowerKEY to other manufacturers and did in fact license it to at least Pioneer, Pace, Panasonic, and Motorola. Id. at *1119 6399-6400. Harte also testified that “Cox did have the technical ability to provide ... support for customers to buy and use their own set-top boxes” because
Cox was already allowing retail television devices, in particular, cable modems. You could buy a cable modem at a Best Buy or an Amazon. You could hook it up and get it activated on the Cox system, which is somewhat similar to a set-top box. In fact, it’s a form of set-top box, but it just doesn’t do television.
Id. at 6367. Specifically, Harte testified that, during the period from 2005 to 2012, Cox did have the technical “ability to bring a TiVo box online that provided two-way services” but that it did not do so. Id. at 6372.
More directly to this point, there was an incident in which a customer acquired a Motorola set-top box on eBay and tried to use it to receive Cox Advanced TV services. Cox’s response to that incident indicates that it was capable of connecting the box, but decided not to do so. On March 5, 2009, Christine Martin sent an e-mail describing a customer complaint. She stated:
They are claiming that we can and have to hook up outside boxes because of the FCC Act of 1996. They think we are holding out simply because we are greedy and want to collect “our $42 a month”. So, someone needs to call these folks and first of all find out what kind of box they have. I’m assuming that will solve the issue since it likely won’t be compatible with our system. And then we’ll need to talk them down and explain that we aren’t being greedy or breaking any rules.
J.A. vol. XXXVII, at 5000. In a reply email to Christine Martin that same day, Delbert Biggs wrote:
As I understand, once a true “retail” box is available (which is not available at this time) we will connect with our cable card, but since this customer bought the box on e-bay, it belongs to some cable system as neither Motorola or SA are providing retail boxes at this time.
Id. at 4999. The next day, March 6, 2009, Kevin Rider responded to the e-mail chain that the boxes the customer had purchased were boxes that had been purchased from Motorola by Advanced Media Technologies, Inc., and Time Warner Cable, Inc. Id. at 4996. Then, on April 10, 2009, Terry Shorter wrote to the e-mail chain that the customer had contacted Advanced Media Technologies and Time Warner Cable. He stated, “Both DVR’s are no longer in the other cable providers systems & they don’t want them back.” Id. at 4993. Billy Hill then replied, “Kevin I was not on the last conference call but wasn’t it communicated that we would not support there boxes in our system?” Id. Kevin Rider then confirmed, “At this time, other than a TIVO box, or cable card TV, no other device is designed for consumer purchase to operate in our system. It was mutually agreed on the conference call that we mil not support these devices that [the customer] purchased on Ebay.” Id. Whether or not we believe Cox’s argument that it did not want to connect the boxes because they were stolen, Cox stated that it was unwilling, not unable to connect the box as a technical matter. In sum, there was ample evidence in the record that sellers were capable of selling premium cable services and set-top boxes separately, and that, at least in Canada and the U.K., sellers did sell the products separately.
Second, Cox charged customers separately for service and for set-top box rental. J.A. vol. LI, at 6326-27. And Cox viewed rental revenue and service revenue separately. J.A. vol. XLI, at 5328.
Third, there was evidence that set-top boxes are not fungible. Harte offered testimony about the various features that set-top boxes can include, such as “Netflix and *1120 apps, programming guides with skipping the television commercials, multinetwork programming guides, the ability to download a movie on a flash drive and take that with you on the plane.” J.A. vol. LI, at 6371. Further, Percy Kirk, Senior Vice President and General Manager for Cox in Oklahoma, testified that boxes were constantly being updated with new and better features and functionality. J.A. vol. L, at 6252. Steve Necessary also testified that different boxes displayed different interactive guides. Id. at 6449. Given these various features and updates, consumers would not see all set-top boxes as equivalent.
Because premium cable services and set-top boxes were sold separately by other sellers,, could be sold separately by additional other sellers, were billed, separately to buyers, and were not fungible, they were separate products, as Cox stipulated.
To the extent the majority concludes otherwise, it appears to do so on the basis that, as a technical matter, it does not believe that Advanced TV from Cox cannot be provided without a set-top box from Cox. For this conclusion, it relies upon factual findings from the Second Circuit in Kaufman v. Time Warner, 836 F.3d 137 (2d Cir. 2016). Specifically, the majority cites Kaufman for the propositions that (1) cable providers must “code their signals to prevent theft,” and “providers do not share their codes,” so, in order “to be useful to a consumer, a cable box must be cable-provider specific, like the keys to a padlock”; (2) that the FCC was unable to force a competitive retail market for set-top boxes, at least in part due to “shortcomings in the new technologies designed to make premium cable available without set-top boxes”; and (3) that “one FCC regulation actually caps the price that cable providers can charge customers who rent set-top boxes.” Maj. Op. at 1104 (citing Kaufman, 836 F.3d at 144,146,147).
Evidence supporting these findings presumably was presented to the court in Kaufman, but it was not presented to the court in this case. The majority notes that the FCC regulation capping set-top box rental prices is not addressed by either party in this case. Maj. Op. at 1104 n.4. Further, there was evidence presented in this trial that Cisco could have sold or rented its set-top boxes directly to customers instead of selling only to Cox, that other manufacturers had licensed Power-KEY from Cisco, enabling them to also make boxes that would connect to Cox’s system, and that Cox was technologically capable of connecting set-top boxes to its system whether or not they were rented from Cox, but chose not to do so.
The majority concludes, “plaintiffs failed to show that Cox’s tie, as opposed to consumer choice, defeated these products or kept their manufacturers from selling them.” Maj. Op. at 1108. It asserts that “[i]f enough customers demanded to buy set-top boxes or set-top-box alternatives directly from manufacturers, the manufacturers could have chosen to sell them directly; Cox’s tie did not preclude them from doing so.” Id. at 1108. This characterization ignores the reality of tying arrangements. Cox’s customers could not demand boxes from manufacturers. As discussed above, if customers did acquire boxes from another source, Cox refused to connect them. Further, the nature of a per se tying claim entitles us to presume that the lack of consumer demand was a direct effect of Cox’s requirement that all its customers rent their set-top boxes from Cox rather than from any other source. Certainly such an arrangement is likely to increase barriers to entry for other potential sellers of set-top boxes because they must compete with a monopolist who can benefit from economies of scale and who has already dominated the market-share. Fortner I, 394 U.S. at 509, *1121 89 S.Ct. 1252; see also Jefferson Par., 466 U.S. at 14, 104 S.Ct. 1551.
The evidence presented to the jury was sufficient for it to conclude that premium cable services and set-top boxes were separate products from the perspective of buyers, and that this is not a case of “zero foreclosure” because other sellers were able to sell the products separately.
C. Market Power
The plaintiffs also presented ample evidence that Cox controlled a substantial share of the market for video services in Oklahoma City. According to Cox’s calculations, from the third quarter of 2009 to the third quarter of 2011, Cox controlled between 68% and 71.5% of the market for video services in Oklahoma City. J.A. vol. XLII, at 5375-76. Those calculations did not take into account “over-the-top” services Cox provides, which are streaming video services such as Hulu and Netflix, but Jennifer Rich, Director of Competitive Strategy for Cox, testified that only 1.5% of customers had “chosen over-the-top video instead of paid TV.” J.A. vol. XXVII, at 4114. She also testified that 35% to 40% of Cox customers subscribed to over-the-top services in addition to cable services. Id. at 4116-17. This indicates that consumers did not view over-the-top services as a substitute for cable services and, even if over-the-top services should have been included in the tying product market, the 1.5% of customers that chose over-the-top services instead of cable would not have a material effect on Cox’s 68% to 71.5% market share.
Ill
Satisfied that the evidence presented at trial was sufficient to support the jury verdict, I must make one additional point which perhaps explains why my views differ from those of the majority. When considering a motion for judgment as a matter of law, it is not our job to decide the case anew, but to uphold the jury verdict unless “the evidence points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury found.” Weese v. Schukman, 98 F.3d 542, 547 (10th Cir. 1996) (quoting Ralston Dev. Corp. v. United States, 937 F.2d 510, 512 (10th Cir. 1991)). This is particularly true in light of the fact that “summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles.” Fortner I, 394 U.S. at 503, 89 S.Ct. 1252; see also id. at 505, 89 S.Ct. 1252 (“[Sjummary judgment in antitrust cases is disfavored.”); Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 467, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (“This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the ‘particular facts disclosed by the record.’” (quoting Maple Flooring Mfrs. Ass’n v. United States, 268 U.S. 563, 579, 45 S.Ct. 578, 69 L.Ed. 1093 (1925))); Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 43, 126 S.Ct. 1281, 164 L.Ed.2d 26 (rejecting a per se rule or rebuttable presumption of market power and instead requiring proof of market power in each case). We are not dealing here with a situation in which one party has asked us to review a grant of summary judgment before a jury has heard all the evidence. But rather, we are dealing with a situation in which the jury has heard that evidence and found for the plaintiff. Thus, when compared to our review of a grant of summary judgment, we should be more hesitant to overturn the verdict of a jury after it has considered all the facts presented at trial. Our role on appeal is to determine only whether there was sufficient evidence in the record to support the jury’s decision. Here, there was.
I respectfully dissent. I would reverse the grant of judgment as a matter of law, reinstate the jury’s verdict on the issue of *1122 liability, and remand for a new trial on the issue of damages.

. Despite the majority’s assertion that the Court "modified its view of tying arrangements” in Jefferson Parish, Maj. Op. at 1099, the elements of a tying claim have always been, and continue to be, as they are stated in Jefferson Parish. See Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 461-62, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("A tying arrangement ... violates § 1 of the Sherman Act if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.” (quoting Fortner Enters., Inc. v. United States Steel Corp. (Fortner I), 394 U.S. 495, 503, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969))); Fortner I, 394 U.S. at 499, 89 S.Ct. 1252 ("[Tying agreements] are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected.” (quoting Int'l Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947))); N. Pac. Ry. Co., 356 U.S. at 6, 78 S.Ct. 514 (same); Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 608-09, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) ("When the seller enjoys a monopolistic posi- *1114 tioYi in the market for the ‘tying’ product, or if a substantial volume of commerce in the ‘tied’ product is restrained, a tying arrangement violates the narrower standards expressed in § 3 of the Clayton Act because from either factor the requisite potential lessening of competition is inferred. And because for even a lawful monopolist it is unreasonable, per se, to foreclose competitors from any substantial market,’ a tying arrangement is banned by § 1 of the Sherman Act whenever both conditions are met.” (emphasis added)).

. Plaintiffs defined the tying product as "premium cable.” Cox’s particular product was called "Advanced TV.”

. Throughout the trial, there was much testimony designed to determine exactly which Advanced TV services were and were not available to consumers through other means, such as by ordering pay-per-view over the phone instead of through a set-top box. See, e.g., J.A. vol. L, at 6191; J.A. vol. LI, at 6366-67. Regardless of which or how many services consumers might have been able to acquire through other means, Cox conditioned the provision of Advanced TV on the rental of a set-top box. In order to acquire Advanced TV services, a consumer was forced to choose which type of set-top-box or CableCARD they wished to rent from Cox. There was no option to order Advanced TV without accepting equipment rental. J.A. vol. XXVII, at 4014-18.