PHILLIPS, Circuit Judge.
Cox Cable subscribers cannot access premium cable services—features such as interactive program guides, pay-per-view programming, and recording or rewinding capabilities—unless they also rent a set-top box from Cox. Dissatisfied with this arrangement, a class of plaintiffs in Oklahoma City (“Plaintiffs”) sued Cox under the antitrust laws. They alleged that Cox had illegally tied cable, services to set-top-box rentals in violation of § 1 of the Sherman Act, which prohibits illegal restraints of trade. See 15 U.S.C. § 1.
Though a jury found that Plaintiffs had proved the necessary elements to establish a tying arrangement, the district court disagreed. In granting Cox’s Fed. R. Civ. P. 50(b) motion, the court determined that Plaintiffs had offered insufficient evidence for a jury to find that Cox’s tying arrangement “foreclosed a substantial volume of commerce in Oklahoma City to other sellers or potential sellers of set-top boxes in *1096 the market for set-top boxes.” Healy v. Cox Commc’ns, Inc. (In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.), No. 12-ML-2048-C, 2015 WL 7076418, *1 (W.D. Okla. Nov. 12, 2015).[1]
In assessing the district court’s ruling, we first examine how the Supreme Court’s treatment of tying arrangements has evolved. Next, we turn to how we and other circuit courts have applied this precedent and how tying law has evolved in the circuit courts. Finally, we analyze the district court’s assessment of what the evidence showed in light of the evolving state of the law. Ultimately, we agree with the district court that Plaintiffs failed to show that Cox’s tying arrangement foreclosed a substantial volume of commerce in the tied-product market, and therefore the tie did not merit per se condemnation. Because we agree with the district court on the foreclosure element, we affirm.
DISCUSSION
I. Standard of Review
We review de novo a district court’s ruling on a Rule 50(b) motion, drawing all reasonable inferences in favor of the nonmoving party and applying the same standard as applied in the district court. Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1023 (10th Cir. 2002). The standard of review for Rule 50 motions “mirrors the standard” for summary-judgment motions under Rule 56(c). Farthing v. City of Shawnee, 39 F.3d 1131, 1139 n.10 (10th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Under Rule 50(b), the district court may allow judgment on the jury’s verdict, order a new trial, or enter judgment as a matter of law for the moving party. We may grant judgment as a matter of law only when “a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.” Fed. R. Civ. P. 50(a)(1). In other words, “judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party’s position.” Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, 843 F.3d 1225, 1247 (10th Cir. 2016) (quoting Elm Ridge Expl. Co. v. Engle, 721 F.3d 1199, 1216 (10th Cir. 2013)).
*1097 II. Background
Considering its expansive reach, the Sherman Act contains remarkably little text and hasn’t been amended since it was enacted in 1890. Thus, antitrust law’s various doctrines are almost entirely judge-made; courts have created these doctrines based on their own interpretations of the Sherman Act’s statutory language and background. For this reason, the statute’s limited language goes only so far, and theory must fill in the gaps. So to understand how and why tying arrangements came to be condemned by antitrust law, we must dive into their theoretical underpinnings.
 A tie exists when a seller exploits its control in one product market to force buyers in a second market into purchasing a tied product that the buyer either didn’t want or wanted to purchase elsewhere. Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006). For example, “[a] supermarket that will sell flour to consumers only if they will also buy sugar is engaged in tying. Flour is referred to as the tying product, sugar as the tied product.” Id. at 33, 104 S.Ct. 1551 (O’Connor, J., concurring). Courts typically apply a per se rule to tying claims.[2] See Int’l Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), abrogated on other grounds by Ill. Tool Works Inc., 547 U.S. 28, 126 S.Ct. 1281. Under a per se rule, plaintiffs prevail simply by proving that a particular contract or business arrangement—in this case, a tie—exists; no further market analysis is necessary, and defendants may not present any defenses. See 9 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1720a (3d ed. 2003) (“The paradigmatic per se rule condemns a readily identified practice without proof of power, effect, or intention and without weighing possible justifications.”).
Early in the Sherman Act’s history, the Supreme Court decided that “tying” two products together disrupted the natural functioning of the markets and violated antitrust law. See Int’l Salt, 332 U.S. at 396, 68 S.Ct. 12. It analyzed tying claims under the per se rule: if a plaintiff could show that a tying arrangement existed, the tie was illegal per se. Id. But the way courts view ties has evolved substantially since tying arrangements first attracted attention in antitrust law. Thus, today’s per se rule against tying is dramatically more nuanced than the typical per se rule. See Areeda & Hovenkamp, supra, ¶ 1720a (explaining the per se tying rule’s multitude of deviations from typical per se rule application). Though the typical antitrust per se rule requires no analysis of market conditions or effects, the Supreme Court has declared that the per se rule for tying arrangements demands a showing that the tie creates “a substantial potential for impact on competition.” Jefferson Par., 466 U.S. at 16, 104 S.Ct. 1551. Today’s plaintiffs must therefore do more than show that a tie exists to trigger the application of the per se rule; they must also meet certain threshold requirements—including that the tie had the substantial potential to *1098 harm competition in the market for the tied product.
III. The Evolution of Tying Law
From the Supreme Court’s tying cases, circuit courts have pulled several elements needed to prove per se tying claims, though these elements differ across the circuits. To succeed on a per se tying claim in the Tenth Circuit, a plaintiff must show that “(1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a ‘not insubstantial’ amount of interstate commerce in the tied product is affected.” Suture Express, Inc. v. Owens & Minor Distrib., Inc., 851 F.3d 1029, 1037 (10th Cir. 2017) (quoting Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 886 (10th Cir. 1997)).
If a plaintiff fails to prove an element, the court will not apply the per se rule to the tie, but then may choose to analyze the merits of the claim under the rule of reason. See Fortner Enters., Inc. v. U.S. Steel Corp., 394 U.S. 495, 500, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (explaining that failure to satisfy per se requirements isn’t always fatal to a tying claim and that a plaintiff “can still prevail on the merits whenever he can prove, on the basis of a' more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated”). The fight in this case is over the fourth element. Plaintiffs claim that “this element only requires consideration of the gross volume of commerce affected by the tie,” and that they “met this requirement by the undisputed evidence that Cox obtained over $200 million in revenues from renting [set-top boxes] during the class period.” Appellants’ Opening Br. at 29. In other words, Plaintiffs would have us infer that because Cox makes a substantial amount of money on set-top-box rentals, the tie necessarily has the requisite potential for anticompetitive effects in the set-top-box market. But both Cox and the district court maintain that this element requires a showing that the tie actually foreclosed some amount of commerce, or some current or potential competitor, in the market for set-top boxes.
Plaintiffs’ argument reflects an outdated view of the law. As we explain below, recent developments in the way courts treat tying arrangements validate the district court’s order and support Cox’s interpretation of tying law’s foreclosure element.
A. The Supreme Court’s Per Se Rule & the Evolution of Tying Law
Two Supreme Court cases, Jefferson Parish and Fortner Enterprises, establish that proof of foreclosure is necessary to prove a per se tying claim. But when the Supreme Court first addressed tying arrangements, it concluded that they served “hardly any purpose beyond the suppression of competition.” E.g., Standard Oil Co. of Cal. v. United States, 337 U.S. 293, 305, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). At that time, the Court placed tying arrangements in the class of “agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.” N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Still, even at this early juncture, the Court seemed to recognize that, unlike price-fixing and market division between competitors, “there is *1099 nothing inherently anticompetitive about packaged sales.” Jefferson Par., 466 U.S. at 25, 104 S.Ct. 1551. So, without claiming to modify its per se rule, the Supreme Court stated that tying arrangements are “unreasonable in and of themselves,” but only “when[] a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a ‘not insubstantial’ amount of interstate commerce is affected.” Fortner Enters., 394 U.S. at 499, 89 S.Ct. 1252 (quoting N. Pac. Ry. Co., 356 U.S. at 6, 78 S.Ct. 514).
This case primarily concerns the foreclosure element of tying claims, which stems from Fortner. In Fortner, the Supreme Court stated that “[t]he requirement that a ‘not insubstantial’ amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie.” 394 U.S. at 501, 89 S.Ct. 1252. But the Court then clarified that “normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie.” Id. To reach this holding, the Court relied on an earlier case in which it stated that “it is ‘unreasonable, per se, to foreclose competitors from any substantial market’ by a tying arrangement.” Id. (quoting Int’l Salt, 332 U.S. at 396, 68 S.Ct. 12).
After Fortner, the Court again addressed tying claims in Jefferson Parish. There, the Court modified its view of tying arrangements. It explained that the rule prohibiting ties aims to prevent sellers from using their power in one market to gain control in a separate market. 466 U.S. at 12, 104 S.Ct. 1551. It also emphasized that antitrust law protects competition, not competitors or even consumer choice or price. Id. at 14-15, 104 S.Ct. 1551. As the Court stated,
[T]he law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other. When the seller’s power is just used to maximize its return in the tying product market .. .• the competitive ideal of the Sherman Act is not necessarily compromised. But if that power is used to impair competition on the merits in another market, a potentially inferior produet may be insulated from competitive pressures. This impairment could either harm existing competitors or create barriers to entry of new competitors in the market for the tied product, and can increase the social costs of market power by facilitating price discrimination, thereby increasing monopoly profits over what they would be absent the tie.
Id. (footnote and citations omitted); see also Areeda & Hovenkamp, supra, ¶ 1726c (“Interference with customer choice is not itself the concern of tying law; rather, the relevant interference is the one that results from an anticompetitive effect in the tied market—namely, from the threat of increased concentration, higher prices, or perhaps an increase in the social costs of preexisting power in the tying market.”). Thus, the Court realized “that every refusal to sell two products separately cannot be said to restrain competition.” Jefferson Par., 466 U.S. at 11, 104 S.Ct. 1551.
Attempting to screen out tying arrangements that posed no danger to competition, the Jefferson Parish Court enumerated several threshold requirements necessary to trigger application of the per se rule against tying. From these requirements, circuit courts have shaped the ele *1100 ments required for per se claims. These requirements included a seller’s power in the tying market, the tying of two distinct products, and, most importantly for our purposes, the likelihood of anticompetitive conduct. Id. at 15-16, 104 S.Ct. 1551. Discretely amending its approach from previous cases such as Fortner and International Salt, the Court also required as a threshold matter a “substantial potential for impact on competition” before it would apply its per se rule to a tying arrangement. Id. at 16, 104 S.Ct. 1551. Even though the Court said that “[t]he rationale for per se rules in part is to avoid a burdensome inquiry into actual market conditions in situations where the likelihood of anticompetitive conduct is so great as to render unjustified the costs of determining whether the particular case at bar involves anticompetitive conduct,” it simultaneously “refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.” Id. at 15 n.25, 16, 104 S.Ct. 1551. It went on to explain that “[o]nee this threshold is surmounted, per se prohibition is appropriate if anticompetitive forcing is likely.” Id. at 16, 104 S.Ct. 1551 (emphasis added). So, not only must plaintiffs demonstrate the existence of certain threshold conditions, they must also show that anticompetitive forcing is likely because of the tie. In this way, the Court acknowledged that some ties have little or no potential to harm competition, and therefore shouldn’t trigger the per se rule.
So, as outlined above, Jefferson Parish modified Fortner. And most recently, the Supreme Court modified the law even further by prohibiting courts from inferring market power over the tying product from a seller’s patent on that product. Ill. Tool Works Inc., 547 U.S. at 31, 126 S.Ct. 1281. Though that decision isn’t factually relevant to our case and bears on a different element, it signifies that “[o]ver the years, ... [the Supreme] Court’s strong disapproval of tying arrangements has substantially diminished.” Id. at 35,126 S.Ct. 1281. This attitude is on display in Jefferson Parish, where the Court stated without qualification that “we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.” 466 U.S. at 16, 104 S.Ct. 1551.
So, even if tying plaintiffs show that a tie affected a substantial dollar volume of sales, they must still show that the tie meets Jefferson Parish’s threshold requirements to trigger the per se rule. In other words, the tying arrangement must be the type of tie that could potentially harm competition in the tied-product market. If “no portion of the market which would otherwise have been available to other sellers has been foreclosed,” then no amount of tied sales could cross the threshold to per se condemnation. Id.; Ar-eeda & Hovenkamp, supra, ¶ 1721d (explaining that if there are no rival sellers of the tied product or if the buyer would not have bought the tied product even from a different seller, then, “[notwithstanding a substantial dollar volume of sales ... the foreclosure is zero and therefore fails to cross the per se ‘threshold.’ ” (quoting Jefferson Par., 466 U.S. at 16, 104 S.Ct. 1551)). Thus, though the per se rule against tying doesn’t require an exhaustive analysis into a tie’s anticompetitive effects in the tied product market, the rule “can be coherent only if tying is defined by reference to the economic effect of the arrangement.” Jefferson Par., 466 U.S. at 21 n.33, 104 S.Ct. 1551.
B. Per Se Tying Law in Other Circuit Courts
Circuit courts have undergone a similar theoretical shift. They first picked up on the peculiar nature of tying claims in Coniglio v. Highwood Servs., Inc., 495 F.2d 1286, 1292 (2d Cir.), cert. denied, 419 U.S. *1101 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). See Areeda & Hovenkamp, supra, ¶ 1722b. In that case, the Second Circuit began explicitly requiring “anticompetitive effect[s]” as an element of a per se tying claim. Coniglio, 495 F.2d at 1292. The plaintiff complained that the Buffalo Bills forced fans to buy tickets to exhibition games along with regular-season home games in season-ticket packages, and that he had no interest in going to the exhibition games. Id. at 1288-89. Without declaring that it was creating a new requirement for tying claims, the court announced that the plaintiffs claim failed because he couldn’t show any anticompetitive effects in the tied-product market. Id. at 1291-92. Because the Buffalo Bills necessarily had a monopoly over regular-season games as well as exhibition games, “there were neither actual nor potential competitors to the Bills in the professional football market.” Id. at 1291 (footnote omitted). Thus, noting that the plaintiff had completely failed “to demonstrate any adverse effect on competition, actual or potential,” the court affirmed the district court’s grant of summary judgment to Highwood Services (the owner and operator of the Buffalo Bills). Id. at 1293.
Other circuits have since taken up this mantle—some have done so explicitly and others implicitly. See Areeda & Hoven-kamp, supra, ¶ 1722a (listing circuits requiring' anticompetitive effects to succeed on tying claims). The Fifth Circuit explicitly required Coniglio’s anticompetitive effects in Driskill v. Dallas Cowboys Football Club, Inc., 498 F.2d 321, 323 (5th Cir. 1974), in which a Dallas Cowboys fan brought the exact same claim as the plaintiff in Coniglio. The Eleventh Circuit then cited Driskill in granting summary judgment to a condominium vendor that required condominium buyers to lease individual interest in common areas. Commodore Plaza at Century 21 Condo. Ass’n v. Saul J. Morgan Enters., Inc., 746 F.2d 671, 672 (11th Cir.), cert. denied, 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 820 (1984). The court stated, “In this case, as in Driskill, the plaintiffs failed to make any showing of coercion or anticompeti-tive effects.” Id.
Building on this growing trend, the First Circuit has stated that tying claims “must fail absent any proof of anti-competitive effects in the market for the tied product.” Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 815 (1st Cir.), cert. denied, 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988). The court moderated this holding, stating that plaintiffs need not prove “the actual scope of anti-competitive effects in the market,” but ultimately adopted Jefferson Parish’s reasoning in stating that “as a matter of practical inferential common sense,” the plaintiff had to “make some minimal showing of real or potential foreclosed commerce caused by the tie.” Id. at 815 n.11.
Similarly, the Seventh Circuit has declined to apply the per se rule to condemn ties that pose no danger to competition. See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821 (7th Cir.1978), cert. denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979). In Ohio-Sealy, the court acknowledged that it was “not free to inquire whether such tying in any given case injures market competition,” but still stated that “if a given tying arrangement has no potential to foreclose access to the tied product market, it does not exemplify the vice that led the [Supreme] Court to declare tying a [p]er se [o]ffense.” Id. at 835.
So, like the Supreme Court, the circuit courts generally recognize that a tie should not be condemned under the per se rule unless it has the potential to harm competition.
*1102 C. Per Se Tying Claims in the Tenth Circuit
Similarly, we have acknowledged that even under a per se rule, we must at least make a threshold determination of potential harm to competition before we can condemn a tying arrangement under the Sherman Act. In Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc., 806 F.2d 953, 955 (10th Cir. 1986), we integrated this caveat to the per se rule into the fourth element of a per se tying claim. There, a company that imported Mazda cars and distributed them to car dealerships refused to sell the dealerships a popular car model, the RX-7, unless the dealers sold a sufficient amount of the less-popular car model, the GLC. Id. at 955-56. The dealerships sued, alleging that the distributor’s allocation method constituted a per se illegal tie under § 1 of the Sherman Act. Id. at 956. While acknowledging that the Supreme Court has deemed certain tying arrangements illegal per se, we specified that tying arrangements posé no risk of foreclosing competition in the tied-product market unless certain elements are present. See id. at 957.
Specifically, we held that tying arrangements must “foreclose to competitors of the tied market a ‘not insubstantial’ volume of commerce.” Id. at 957 (emphasis added) (quoting Fortner, 394 U.S. at 499, 89 S.Ct. 1252). In Fox Motors, “[t]he record contained] no indication that the alleged tying arrangement, as distinct from consumer demand, influenced the level” of competition in the tied-product market. Id. at 958. Therefore, even though proof of anticompetitive effects was not an explicit element of tying claims in the Tenth Circuit, we still concluded that the tying arrangement “simply [did] not imply a sufficiently great likelihood of anticompetitive effect.” Id. Because the tie failed to .foreclose any competing car manufacturers, it didn’t meet Jefferson Parish’s threshold requirements for per se treatment. Id. Thus, we incorporated proof of actual or likely anticompetitive effect into the foreclosure element of tying claims. In doing so, we heeded Jefferson Parish’s warning that some tying arrangements simply don’t pose the same level of risk as those behaviors whose potential to harm competition is so pronounced as to deserve per se condemnation without regard to their actual impact on the market.
D. Per Se Tying Law & Technology
Courts have also acknowledged that some industries or products are sufficiently distinct that per se treatment is inappropriate. This is especially true in the world of technology, where courts are often unfamiliar with the products and market structure, and thus can’t be certain of the potential for anticompetitive effects.
Per se rules of antitrust illegality are reserved for those situations where logic and experience show that the risk of injury to competition from the defendant’s behavior is so pronounced that it is needless and wasteful to conduct the usual judicial inquiry into the balance between the behavior’s procompetitive benefits and its anticompetitive costs.
Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 486-87, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (Scalia, J., dissenting). The D.C. Circuit applied this principle in United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001). Though the factual circumstances of that case are quite different from our own, we find the D.C. Circuit’s reliance on Eastman Kodak and Jefferson Parish illuminating. There, the court faced a novel tying arrangement in which Microsoft had integrated the internet web browser, Internet Explorer, into Windows, its computer operating system. Id. at 45. Noting that some business relationships “represent entire, novel catego *1103 ries of dealings,” the court concluded that “simplistic application of per se tying rules” would be inappropriate. Id. at 84. The court acknowledged that tying arrangements can impact buyers’ independent judgment in the tied-product market, but it went on to state that when “competitive firms always bundle the tying and tied goods,” the tie should not trigger the per se rule. Id. at 86. “Indeed, if there were no efficiencies from a tie (including economizing on consumer transaction costs such as the time and effort involved in choice),” consumers would always purchase a product’s component parts separately. Id. at 87. Thus, because even firms without market power integrated internet web browsers and computer operating systems, and the court was dealing with a relatively novel tying arrangement, the court refused to apply the per se rule to condemn the tying arrangement. Id. at 93.
A recent Second Circuit case, Kaufman v. Time Warner, 836 F.3d 137 (2d Cir. 2016), builds on Microsoft and is even more relevant to our analysis because it concerns the same tie by a different cable company. Similar to our case, the plaintiffs were a class of Time Warner Cable subscribers who were forced to rent set-top boxes to receive premium cable services. Though tying claims in the Second Circuit differ from ours by explicitly requiring a showing of anticompetitive effects in the tied:product market, the court’s analysis in Kaufman is still very useful. See id. at 141. The court thoroughly explained the technology behind premium cable and set-top boxes and demonstrated why the tying arrangement at issue didn’t trigger the application of the per se rule.[3]
To start, the court explained that cable providers sell their subscribers the right to view certain packages of programming. Id. at 144. But the content creators—companies like HBO that produce television shows—require the cahle companies to prevent viewers' from stealing their content. Id. Set-top boxes solve this problem—cable providers “code their signals to prevent theft,” and cable boxes receive the providers’ coded signals and “unscramble” them. Id. “Unsurprisingly, providers do not share their codes with cable box manufacturers .... Therefore, to be useful to a consumer, a cable box must be cable-provider specific, like the keys to a padlock.” Id.
After explaining the function of set-top boxes, the Second Circuit turned to the regulatory environment and the history, of the cable industry’s use of set-top boxes. Significantly, the court pointed out that “[ajntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue” because “the existence of a regulatory structure designed to ... perform! ] the antitrust function” might “diminish!] the likelihood of major antitrust harm.” Id. at 145 (second and third alterations in original) (quoting Verizon Commc’ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 411-12, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004)). The court described the Federal Communication Commission’s (“FCC”) attempts over the past twenty years to disaggregate set-top boxes from the delivery of premium cable, and stated that the FCC’s failure is at least partly attributable to shortcomings in the new technologies designed to make premium cable available without set-top boxes. See id. at 146 (“[A] new approach that would work with two-way services [failed because it] was not sophisticated enough to *1104 meet content companies’ content protection demands.” (alterations in original) (quoting Expanding Consumers’ Video Navigation Choices; Commercial Availability of Navigational Devices, 81 Fed. Reg. 14,033, 14,033-04 (Mar. 16, 2016))).
,The court also pointed out that one FCC regulation actually caps the price that cable providers can charge customers who rent set-top boxes.[4] See 47 C.F.R. § 76.923(f)—(g). Under the regulation, cable companies must calculate the cost of making such set-top boxes functional and available for consumers, and must charge customers according to those costs, including only a “reasonable profit” in then-leasing rates. Id. § 76.923(c). The Second Circuit ultimately concluded that the plaintiffs’ factual allegations against Time Warner couldn’t survive summary judgment because they didn’t trigger the application of the per se tying rule. Id. at 147.
In sum, it is now clear that before applying the per se rule to tying arrangements, courts must carefully analyze the tie to ensure that it meets Jefferson Parish’s threshold requirements. If it does not, the court may further analyze the tie using the rule of reason to determine whether it actually harms or threatens to harm competition.[5]
IV. Analysis
A. Foreclosure of a Substantial Volume of Commerce
This case comes down to what it means to foreclose a “not insubstantial” volume of commerce. As we discussed, a per se tying claim has four elements, and we have concluded that the fourth element—foreclosure—requires proof of actual or potential anticompetitive effects in the tied-product market. Based on the Supreme Court’s tying cases and our own precedent, Plaintiffs failed to show that the tie had the substantial potential to foreclose competition. See Jefferson Par., 466 U.S. at 15-16, 104 S.Ct. 1551; Fox Motors, 806 F.2d at 957-58.
The jury found that Plaintiffs had met their burden of showing that Cox’s tie had foreclosed a substantial amount of commerce in the set-top-box market. The jury-verdict form asked, “Has the alleged tying arrangement foreclosed a substantial volume of commerce in the Oklahoma City subsystem to other sellers or potential sellers of set-top boxes in the market for set-top boxes?” Joint App. vol. Ill at 614. The jury circled “Yes.” Id. But a careful review of the record in light of post-Jefferson Parish law reveals that the record does not support the jury’s conclusion. Rather, just as the district court found, Cox’s tie didn’t foreclose any commerce, nor did it prevent or even discourage other competitors from entering the market. Therefore, Cox’s tie didn’t meet the foreclosure element’s threshold requirements necessary to trigger the per se rule against tying.
B. The Jury Instruction Was Correct
Plaintiffs vehemently argue that they presented enough evidence to show that Cox’s tie affected a substantial volume of commerce. But before we can reach the evidence, we must address Plaintiffs’ claim that the law and the foreclosure-of-com- *1105 meree jury instruction required them to show only that Cox’s set-top-box rental proceeds yielded more than a de minimis dollar amount. Plaintiffs argue that to satisfy this element of their claim, the jury instructions properly required them to show only that Cox’s set-top-box rental profits were more than de minimis. They claim that neither the jury instruction nor the law required any further proof for them to meet their burden on this issue. Their argument fails because it emphasizes one line of the jury instruction at the expense of the remainder. When read as a whole, the jury instruction implements the overall goals of tying law and Jefferson Parish’s threshold requirements.
The jury instruction on the foreclosure-of-commerce element, Jury Instruction 19, contained two paragraphs:
The fourth element that Plaintiffs] must prove is whether, during the class period, [Cox] has foreclosed a substantial amount of commerce to other sellers or potential sellers of set-top boxes in the market for set-top boxes. This occurs when the tying of two products either prevents competitors from selling the tied product or limits the choice available to consumers in the purchase of the tied product.
In determining whether [Cox] has foreclosed a substantial amount of commerce in the relevant market for set-top boxes, you should first consider the total dollar amount of [Cox’s] leases of set-top boxes in Oklahoma City achieved by the tying arrangement in absolute terms. If the.dollar amount of [Cox’s] leases of set-top boxes was substantial, then you should find that [Cox] has foreclosed a substantial amount of commerce.
Joint App. vol. Ill at 601 (emphasis added). Upon Cox’s renewed Rule 50(b) motion, the district court concluded that Plaintiffs had failed to prove the foreclosure element of their tying claim because “Plaintiffis] failed to offer evidence from which a jury could determine that any other manufacturer wished to sell set-top boxes at retail or that Cox had acted in a manner to prevent any other manufacturer from selling set-top boxes at retail.” In re Cox Enters., 2015 WL 7076418, at *1.
Plaintiffs contend that nothing in the jury instructions required them to offer such evidence. Instead, they seize upon the last sentence of the jury instruction, arguing that to prevail on the foreclosure element, they needed to show only that Cox made a substantial amount of money on its set-top-box leases. We acknowledge that reading the last sentence in isolation could lead a jury to believe that plaintiffs met the foreclosure element just by showing that the defendant made a substantial amount of money on the tied product. But, though inartfully drawn, the instruction must be read as a whole.[6] And when doing so, we believe it evident that Plaintiffs’ reading—elevating the last sentence above the rest of the instruction—is incorrect.[7]
*1106 In fact, Plaintiffs’ interpretation of Jury-Instruction 19 would render the entire first paragraph of the jury instruction meaningless. This paragraph is not merely explanatory; it defines the fourth element’s affirmative requirements. As a threshold matter, it provides that Plaintiffs must show not only that Cox has foreclosed a substantial volume of commerce, but that it has foreclosed this commerce “to other sellers or potential sellers of set-top boxes.” Joint App. vol. Ill at 601 (emphasis added). The paragraph then goes on to explain that in a tying claim, plaintiffs must show that the tying arrangement caused the foreclosure—either by preventing new competitors from entering or by driving existing competitors out of the tied-product market.
When read in context, the first paragraph of Jury Instruction 19 restricts the meaning of its last sentence. The dollar amount of Cox’s set-top-box leases that is relevant to the foreclosure element must have been achieved by the tie. This is important—the foreclosure must result from the tie itself, not from any other anticompetitive conduct (which would be a' different claim altogether), or from any external factors unrelated to the tie. But the total dollar amount of the leases doesn’t matter if Cox’s tie wasn’t the reason its customers leased set-top boxes from Cox. In other words, Jury Instruction 19 properly explains that making money from a tying arrangement doesn’t violate § 1 of the Sherman Act unless the defendant, by doing so, has actually or potentially foreclosed or injured competition in the tied-product market.
This interpretation of the jury instruction accords with the Supreme Court’s tying-law precedent. See Jefferson Par., 466 U.S. at 15-16, 104 S.Ct. 1551 (“Per se condemnatioh—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable. Thus, application of the per se rule focuses on the probability of anticom-petitive consequences. Of course, as a threshold matter there must be a substantial potential for impact on competition in order to justify per se condemnation.”). It also accords with our own tying-law precedent. See Fox Motors, 806 F.2d at 959 (declining to condemn the alleged tying arrangement because it didn’t foreclose competing manufacturers and therefore “cannot be characterized as a tying arrangement of the kind presumptively condemned under the antitrust laws”).
As we discussed above, the question of whether to apply the per se rule to tying claims has become increasingly complex as courts have begun to question whether tying arrangements actually deserve per se condemnation. See Ill. Tool Works, 547 U.S. at 35, 126 S.Ct. 1281 (noting that “strong disapproval of tying arrangements has substantially diminished”); Jefferson Par., 466 U.S. at 35, 104 S.Ct. 1551 (O’Connor, J., concurring) (“The time has ... come to abandon the ‘per se’ label and refocus the inquiry on the adverse economic effects, and the potential economic *1107 benefits, that the tie may have.”). Because tying claims often present little or no potential to harm competition—and thus, no antitrust concerns—plaintiffs alleging per se unlawful tying arrangements must do more to meet the foreclosure element than point to a dollar amount. See Jefferson Par., 466 U.S. at 15-16, 104 S.Ct. 1551. They must show that the alleged tying arrangement had the potential to or actually did injure competition. Thus, even before we reach the application of the per se rule, the plaintiffs must show that this is the type of tie that threatens to harm competition such that it deserves per se treatment. Here, the jury instruction properly required the Plaintiffs to do so, and the Plaintiffs failed to meet their burden.
C. Plaintiffs Failed to Show Foreclosure
Turning to the district court’s order granting Cox’s Rule 50(b) motion, the district court found that Cox hadn’t foreclosed any commerce because, through no fault of Cox’s, no manufacturers sold or even wanted to sell set-top boxes directly to consumers. In re Cox Enters., 2015 WL 7076418, at *1. Plaintiffs argue that they presented more than enough evidence to show that the lack of competition in the set-top-box market resulted from Cox’s tying arrangement. We acknowledge that we must not disregard the jury’s verdict. But in light of our analysis of the foreclosure element, we agree with the district court that Plaintiffs failed to present evidence sufficient to show that Cox’s alleged tie foreclosed a substantial volume of commerce in the market for set-top boxes. In other words, “the evidence points but one way and is susceptible to no reasonable inferences which may support [Plaintiffs’] position.” Auraria Student Hous., 843 F.3d at 1247 (quoting Elm Ridge Expl. Co., 721 F.3d at 1216). We therefore conclude that the tie did not trigger the application of the per se rule.
Similar to Fox Motors and Microsoft, our case simply doesn’t merit per se condemnation. Four factors support our conclusion. First, Cox was an intermediary between set-top-box manufacturers and cable customers. Second, Cox had no competitors in the set-top-box market. Third, all cable companies similarly tie premium cable services to set-top-box rentals, suggesting that net efficiencies and technological constraints—rather than desire to gain monopoly power in the tied-product market—necessitated the tie. Finally, the FCC’s regulatory involvement in set-top boxes further diminishes the possibility that Cox’s tie could harm competition in that market.
We begin with the significant fact that Cox does not manufacture the set-top boxes that it rents to customers. On appeal, Plaintiffs completely failed to address this unique market structure. Cox acts as an intermediary between the set-top-box manufacturers and the consumers that use them. That Cox purchases the boxes from. manufacturers—and does not make the boxes itself—means that what it later does with the boxes has little or no effect on competition between set-top-box manufacturers in the set-top-box market. See Aree-da & Hovenkamp, supra, ¶ 1709e4 (when sellers simply buy a product from existing manufacturers and resell them to tied customers at a profit, “the tie neither limits the marketing opportunities of the several manufacturers of the second product nor impairs the vitality of competition in their market. Each of those manufacturers remains free to compete for the patronage or blessing of the tying defendant....”).
In fact, competition in the set-top-box market might continue to be robust because set-top-box manufacturers must continue to innovate and compete with each other to maintain'their status as the preferred manufacturer for as many cable *1108 companies as possible. Id. As a prominent antitrust scholar has noted, “a foreclosure is of doubtful significance when the tying seller does not make the tied product but merely purchases it from independent suppliers,” id. ¶ 1709a, because “[a] tie cannot bring the defendant power in a market that it does not inhabit.... [S]uch a defendant does not itself ‘invade’ or ‘dominate’ the market for the tied product,” id. ¶ 1726dl (citing Carl Sandburg Vill. Condo. Ass’n No. 1 v. First Condo. Dev. Co., 758 F.2d 203, 207 (7th Cir. 1985); Ohio-Sealy, 585 F.2d at 834-35).
Though the risk of foreclosing competition increases when the seller’s customers—here, Cox’s premium cable subscribers—are the only purchasers of the tied product, the risk is offset in this case because if they chose to, set-top-box manufacturers could sell their wares directly to cable customers. But none do. If enough customers demanded to buy set-top boxes or set-top-box alternatives directly from manufacturers, the manufacturers could have chosen to sell them directly; Cox’s tie did not preclude them from doing so. In fact, Cox presented testimony from the executives of several set-top-box manufacturers confirming that Cox had no impact on their decisions not to sell set-top boxes at retail or directly to consumers.
Second, that no manufacturers chose to sell their products to consumers, either directly or at" retail, means that Cox has no existing rivals in the set-top-box market (as the district court pointed out). Though Plaintiffs maintain that they don’t need to prove the existence of any competitors in the tied-product market, they allege that Cox’s tie likely caused the lack of competitors in the set-top-box market. Even if Cox had created an effective tie—and it very well might have done so—the lack of competitors in the set-top-box market doesn’t prove that the tie foreclosed commerce or harmed competition in that market.
Plaintiffs alternatively argue that numerous actual and potential competitors existed in the retail market for set-top boxes. To support their claim, Plaintiffs point to evidence that many manufacturers were certified to offer CableCard-enabled products at retail. But in doing so, Plaintiffs again ignore that representatives of these manufacturers testified that they chose not to sell their set-top boxes at retail for reasons unrelated to Cox’s tie. Plaintiffs also argue that TiVo wanted to sell a set-top box at retail but couldn’t move forward with this plan due to a falsely manufactured “indemnification issue” on Cox’s part. Appellant’s Opening Br. at 25.
But contrary to Plaintiffs’ contention, the record suggests instead that both Cox and TiVo thought their first attempt at TiVo boxes that integrated Cox’s premium cable services operated too slowly to offer to customers, and that after the indemnification issue stalled their second project (which was not close to completion in any case), Cox and TiVo moved on to a third initiative to continue trying to make TiVo’s box compatible with Cox’s premium cable services. Finally, Plaintiffs point out that many other manufacturers were interested in the set-top-box market, and that a few companies offered Tru2Way products for sale at retail. But Plaintiffs failed to show that Cox’s tie, as opposed to consumer choice, defeated these products or kept their manufacturers from selling them.
So here, we have no foreclosure, and zero-foreclosure ties present no antitrust concerns. See Areeda & Hovenkamp, supra, ¶ 1723a (“When there are no rival sellers of the tied product, then the alleged tie might affect a substantial volume of commerce in the tied product and yet not foreclose anyone.”). Because set-top-box manufacturers choose not to . sell set-top boxes at retail or directly to consumers, “no rival in the tied market could be foreclosed by” Cox’s tie, and therefore “the *1109 alleged tie ‘does not fall within the realm of contracts “in restraint of trade or commerce” proscribed by Section 1 of the Sherman Act....’” Id. ¶ 1723b (quoting Coniglio, 495 F.2d at 1292).
Plaintiffs contend that the zero-foreclosure rule applies only where consumers don’t want the tied product or where no other seller is capable of selling the tied product for reasons unrelated to the tie. This argument misreads the case law. Though some courts have found that no rival sellers exist when no other sellers are capable of selling the tied product, see-Coniglio, 495 F.2d at 1291, nowhere did those courts state that this was the only occasion where the lack of rival sellers would excuse a tie. Here, the record shows that Cox’s tie didn’t cause the lack of competitors in the set-top-box market because several manufacturers testified that Cox’s actions had no impact on their decision to enter the retail market. This removes the tie from the category of tying claims deserving per se condemnation.
Third, as the D.C. Circuit found so significant in Microsoft, all cable companies rent set-top boxes to consumers. See Microsoft, 253 F.3d at 86; see also Kaufman, 836 F.3d at 144 (“[T]he Complaint lacks any allegation that there have ever been separate sales of set-top boxes and cable services ... in the United States, even in markets where cable providers face competition .... ”). This suggests that tying set-top-box rentals to premium cable is simply more efficient than offering them separately. Microsoft, 253 F.3d at 88 (“[B]undling by all competitive firms implies strong net efficiencies.”); see also Areeda & Hovenkamp, supra, ¶ 1729e2 (“[T]he most likely inference to be drawn from similar ties imposed by each firm in a market, whether concentrated or uncon-centrated, is that competition rather than oligopoly has forced the tie.”). Here, technology requirements dictate that consumers rent or buy set-top boxes to receive all of Cox’s services. See Kaufman, 836 F.3d at 144 (“A cable box must be designed to receive the signal from a particular provider, which requires the provider’s cooperation. And because providers code their signals to prevent theft, a cable box must also be able to unscramble the coded signal of the particular provider.”). Plaintiffs point out that efficiency and technology aren’t the only reasons for Cox’s tying arrangement, because cable companies make a hefty profit on set-top-box rentals. But the mere fact that Cox profited from set-top-box rentals doesn’t justify applying the per se rule. See Carl Sandburg, 758 F.2d at 208 (“[PJlaintiff does not establish the requisite economic interest in the tied product market merely by alleging that the tying seller is receiving a profit from the transaction as a whole.”). Tying law is concerned with protecting competition; “high prices standing alone are not the evil that antitrust tying law condemns.” Areeda & Hovenkamp, supra, ¶ 1724a.
Still, Plaintiffs also suggest that this profit-making potential drove Cox to propagate its tie by refusing to support technologies that allowed or would allow customers to access Cox’s services without renting set-top boxes from Cox. Even if such support was required,[8] the record simply fails to show that Cox withheld that support. Cox submitted abundant evidence that it supported both CableCard and Tru2Way technologies.[9]
*1110 Plaintiffs don’t contest that evidence; they simply say that Cox’s efforts to open the set-top-box market to other competitors were insufficient. They claim that Cox didn’t do enough to inform its customers that it would support CableCard and Tru2Way. Assuming that this evidence is even relevant to whether Cox’s tie foreclosed competition in the set-top-box market, Plaintiffs’ argument fails. They argue that Cox sabotaged CableCard by not planning any “proactive marketing initiatives” to promote it. Appellant’s Opening Br. at 19 (internal citation and quotation marks omitted). But Cox had no obligation to promote CableCard, and when customers chose to use that technology, Cox did nothing to stop them. See Christy Sports, LLC v. Deer Valley Resort Co., 555 F.3d 1188, 1197 (10th Cir. 2009) (“The Sherman Act does not force [a business] to assist a competitor in eating away its own customer base ... ”). Cox’s communication to customers that they couldn’t access interactive cable services without renting a set-top box was simply a true statement based on the technological limitations of Cable-Card. Until Tru2Way was ready for release, the only interactive cable service available to Cox customers without a set-top box was pay-per-view, which customers could obtain by phone.[10]
Moreover, when Tru2Way became available, Cox told customers in its annual notice that it was preparing to support, and then in a later noticé that it did support, the technology. Plaintiffs fault Cox for hiding that information in brochures that no one reads, but we decline to hold Cox liable under the Sherman Act simply because customers failed to read Cox’s annual published statements. Moreover, Cox has no duty to support new technology by affirmatively pushing it on consumers. See Christy Sports, 555 F.3d at 1197. Accepting that the CableCard and Tru2Way technologies—along with the televisions or TiVo boxes customers needed to use those technologies—qualified as substitutes for set-top boxes, we still could not say that Cox’s tie had any detrimental effect on their vitality. Consumers were free to pursue those technologies instead of renting set-top boxes from Cox, but even the FCC concluded that they failed for reasons unrelated to cable companies’ tying arrangements. See 81 Fed. Reg. at 14,033.
Plaintiffs also point to evidence that Cox refused to support one customer who had purchased 'a set-top box on eBay. Their argument assumes that in doing so, Cox foreclosed what could have been a thriving, second-hand set-top-box market by refusing to provide cable to customers who purchased their set-top boxes from such marketplaces. We agree with Plaintiffs that this refusal implicates the concern of tying law: that by refusing to support a customer who actually did purchase a set-top box from someone other than Cox, the cable company used its monopoly power in the premier cable market to foreclose competition in the set-top-box market. But Cox, in turn, presented compelling evidence justifying its refusal. Based on Cox’s experience and knowledge, no set-top box *1111 manufacturers sold their wares directly to consumers, so it surmised that a customer had rented this set-top box from some other cable company and, instead of returning it, sold it on eBay. Therefore, for reasons other than the tie, Cox justifiably refused to enable the set-top box to decode its protected content.
Fourth, the regulatory environment of the cable industry precludes the possibility that Cox could harm competition with its tie.[11] We agree with the Second Circuit that the “regulatory price control on the tied product makes the plaintiffs’ tying claim implausible as a whole.” Kaufman, 836 F.3d at 146. After all, the regulatory cap on the profits that cable companies can procure in the set-top-box market diminishes the already-low likelihood that Cox is attempting to or could possibly obtain monopoly power in the set-top-box market. Moreover, cable companies’ obligation to protect the content they provide to their viewers justifies their, refusal to enable set-top-box manufacturers to decode such content. As Cox pointed out, cable providers are accountable to content creators to protect such content; thus, their tie serves a functional purpose. Because “as a threshold matter there must be a substantial potential for impact on competition in order to justify per se condemnation,” Jefferson Par., 466 U.S. at 16, 104 S.Ct. 1551, the tie in this case doesn’t trigger the application of tying’s per se rule. See Kaufman, 836 F.3d at 147 (“The insufficiency of the allegations of a separate market for bidirectional cable boxes, the inability of the FCC to create such a market, and the price regulation of the tied product further persuade us that the Complaint does not plead a plausible tying claim.”).
Plaintiffs do not contest the goals of antitrust tying law. Indeed, the fatal flaw in their argument is that it elevates form over function and fails to acknowledge the reasoning behind the Supreme Court’s threshold requirements for triggering the per se rule against tying. Instead of explaining why the tie is dangerous despite Cox’s lack of competitors in the set-top-box market, Plaintiffs insist that they need to show only that set-top-box rentals accounted for a substantial dollar amount. They insist that the “tying arrangement ] [is] illegal in and of [itself], without any requirement that the plaintiff make a showing of unreasonable competitive effect.” Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 540 (9th Cir. 1983), overruling recognized by Chroma Lighting v. GTE Prods. Corp., 111 F.3d 653 (9th Cir. 1997). They urge that we must presume anticompetitive effects based on nothing more than the dollar amount of Cox’s set-top-box sales. See Digidyne Corp. v. Data Gen. Corp., 734 F.2d 1336, 1338 (9th Cir. 1984).
But as thoroughly discussed above, “the Supreme Court has continued to add more real-market analysis to the requirements of a per se tying claim.” Suture Express, 851 F.3d at 1038. In doing so, it has informed us that not all ties threaten to harm competition such that they must be declared illegal per se. And here, Cox’s tie has no potential to foreclose competition in the set-top-box market, and therefore fails to meet Jefferson Parish’s threshold re *1112 quirements to trigger the per se rule against tying.[12]
D. Application of the Rule of Reason
Plaintiffs also contend that the district court improperly applied the rule of reason to their claim instead of using a per se analysis. As discussed above, the per se analysis for tying arrangements differs from other types of per se antitrust claims because tying arrangements often pose no risk to competition. Because we conclude this tie falls outside the realm of the traditional per se analysis, the district court rightly refused to condemn Cox’s tie as illegal per se. And we don’t have to apply the rule of reason unless Plaintiffs also argued that the tie was unlawful under a rule of reason analysis. See Fox Motors, 806 F.2d at 959 n.3. Because Plaintiffs argued that tying arrangements must be analyzed under the per se rule, we need not address whether Cox’s tie would be illegal under a rule of reason analysis.[13]
CONCLUSION
For the foregoing reasons, we affirm the district court’s order granting Cox judgment as a matter of law under Rule 50(b).

. The district court also concluded that Plaintiffs had failed to show anticompetitive injury, meaning that Plaintiffs’ evidence was insufficient for the jury to conclude "that loss or injury arose from the competition-reducing aspect of [Cox’s] behavior.” In re Cox Enters., 2015 WL 7076418, at *2. On appeal, the parties dispute whether Plaintiffs needed to show antitrust injury, which we have defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant’s acts unlawful.” Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1124 (10th Cir. 2005) (quoting Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 962 n.15 (10th Cir. 1990)). We need not reach that question, however, because we agree with the district court that Plaintiffs failed to meet their burden to show that Cox foreclosed a substantial amount of competition, the fourth element of a per se tying claim.
Similarly, because we affirm the district court, we decline to address the issues that Cox raises in its cross-appeal. Specifically, Cox asked us to review Plaintiffs’ failure to define a viable tying product, the proper geographic market for the tying product, and a valid theory of damages, as well as Plaintiffs' failure to address the impact of the National Cooperative Research and Production Act, whether certain class members should have been excluded from the claim, whether the "verdict in this case provides a permissible basis for awarding damages to the individual class members,” and whether we must remand for a new trial "because the jury instructions did not accurately convey the essential elements of a tying claim.” Appellee’s Response Br. at 4.

. Only some types of antitrust claims receive per se treatment; all others are analyzed using a rule of reason. See Fortner Enters., Inc. v. U.S. Steel Corp., 394 U.S. 495, 499-500, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (plaintiffs who fail to establish a per se tying violation “can still prevail on the merits whenever [they] can prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated”). Under the rule of reason, plaintiffs must prove "the actual effect of the [tying arrangement] on competition.” Jefferson Par., 466 U.S. at 29, 104 S.Ct. 1551.

. Though the Second Circuit rejected the plaintiffs' claim because set-top boxes and premium cable services aren't two distinct products, its analysis supports the conclusion we reach here today—namely, that the tie at issue doesn't meet the per se rule’s threshold requirements.

. Neither Healy nor Cox addresses this regulation. Still, it is relevant to the issue at hand because it limits the amount of power Cox can obtain in the tied-product market.

. Courts need apply a rule-of-reason analysis to a per se tying claim only if plaintiffs argue that the tie is illegal under the rule of reason as well'. See Fox Motors, 806 F.2d at 959 n.3 ("Because the challenged allocation system was not unlawful under the per se rule and because plaintiffs have not challenged its legality under the Rule or [sic] Reason, we need not consider whether the evidence of a conspiracy between defendants was sufficient.”).

. A proper reading of the instruction does not cast off earlier requirements just because the instruction does not go to the trouble, and length, to repeat them in every sentence. When the last sentence is read as part of the whole instruction, it gives effect to earlier language, meaning this: “If the dollar amount of [Cox's] leases of set-top boxes [achieved by the tying arrangement] was substantial, then you should find that [Cox] has foreclosed a substantial amount of commerce [to other sellers or potential sellers of set-top boxes in the market for set-top boxes].”

. Plaintiffs argue that “[e]ven if ... the jury instructions were incomplete or incorrect, the remedy is a new trial under correct instructions and not judgment in favor of Cox.” Appellants' Response Br. at 23-24. But a new trial with a jury instruction that more clearly explained the foreclosure element wouldn’t change the outcome of this case.
As we explained above, the foreclosure element of a per se tying claim in our circuit requires a showing that the tie had the potential to or actually did harm competition in the tied-product market. Having "been fully *1106 heard on [the] issue ... there is no legally sufficient evidentiary basis for a reasonable jury to find for [Plaintiffs]” under the law. Fed. R. Civ. P. 50(a)(1). In other words, the record shows that Cox's tie was not the sole— or even the primary—reason that Plaintiffs couldn’t purchase set-top boxes or their alternatives from other manufacturers. See In re Cox Enters., 2015 WL 7076418, at *1 ("Plaintiffs] failed to offer evidence from which a jury could determine that any 'other manufacturer wished to sell set-top boxes at retail or that Cox had acted in a manner to prevent any other manufacturer from selling set-top boxes at retail.”). Therefore, the tie didn’t foreclose competition in the tied-product market and the district court properly granted Cox judgment as a matter of law under Rule 50(b).

. Such support is not required. See Kaufman, 836 F.3d at 144 ("[T]he core issue is a cable provider's right to refuse to enable cable boxes it does not control to unscramble its coded signal.”).

. The former enabled Cox customers to receive one-way services without a set-top box, and the latter enabled them to receive two-way services without a set-top box. Importantly, though, both technologies still required additional hardware to work. The customer *1110 would need a CableCard- or Tru2Way-en-abled television or a TiVo box to avoid having to purchase or rent a set-top box. As explained above, this functionality strongly indicates a need for the tie that is separate from Cox’s desire to profit from set-top-box rentals.

. Whether Cox should have required its sales force to explain to each customer exactly what was available with a set-top box versus CableCard technology is a different question that is irrelevant to whether the tie foreclosed a substantial amount of commerce. Cox supported the CableCard and Tru2Way technologies, meaning that it spent money to make its systems compatible with both technologies. When asked, Cox sales representatives accurately told customers what they could obtain by using CableCard.

. Plaintiffs point out that Congress passed the 1996 Telecommunication Act to "assure the commercial availability, to consumers ... of ... equipment used ... to access multichannel video programming and other services offered over multichannel video programming systems, from manufacturers, retailers, and other vendors not affiliated with any multichannel video programming distributor." Appellants' Opening Br. at 15 (quoting 47 U.S.C. § 549). But this law does nothing to help their cause. As Plaintiffs explain, this law led to the development of Ca-bleCard and Tru2Way, which both failed for technological reasons. Kaufman, 836 F.3d at 146.

. We express no opinion here over whether Plaintiffs could have shown a "contract, combination ..., or conspiracy, in restraint of trade” under § 1 of the Sherman Act. 15 U.S.C. § 1. Leaving aside testimony from set-top box manufacturers that Cox had nothing to do with their decision not to sell directly to consumers, Cox could have engaged in nefarious conduct with other cable companies that diminished competition in the set-top-box market. To protect their profits, cable companies could have banded together to dissuade manufacturers from selling set-top boxes at retail. But Plaintiffs don’t make this claim, nor did they present evidence of any such behavior.

. Still, we note that. Plaintiffs' claim would likely have failed either way. Because their claim failed under the more plaintiff-friendly per se analysis, it would also likely fail under the more demanding rule-of-reason analysis. See Areeda & Hovenkamp, supra, ¶ 1726f (explaining that when a seller purchases the tied product from a third party, "the very doubt that ousted per se treatment also makes it unlikely that an alleged tie of this character will be found to be unreasonable”).